1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   LENA M. BAKER,                              CASE NO. 1:10-cv-01380-SMS

10                        Plaintiff,
                                                ORDER AFFIRMING AGENCY'S
11        v.                                    DENIAL OF BENEFITS AND ORDERING
                                                JUDGMENT FOR COMMISSIONER
12   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
13
                         Defendant.
14   _____/

15
16        Plaintiff Lena M. Baker, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks

17   judicial review of a final decision of the Commissioner of Social Security ("Commissioner")

18   denying her application for disability insurance benefits under Title II of the Social Security Act

19   (42 U.S.C. § 301 *et seq.)* (the "Act").  The matter is currently before the Court on the parties'

20   cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder,

21   United States Magistrate Judge.  Following review of the record as a whole and applicable law,

22   this Court affirms the agency's determination to deny benefits to Plaintiff.

23   **I.    Administrative Record**

24        **A.    Procedural History**

25        Plaintiff was insured under Social Security through December 31, 2006.  On February 22

26   and November 6, 2002, Plaintiff filed for disability insurance benefits, alleging disability

27   beginning November 12, 2001, attributable to non-Hodgkin's lymphoma.  Her claims, which were

28   consolidated for evaluation, were denied initially and upon reconsideration.  Plaintiff appeared

and testified at a hearing on November 9, 2004.  On January 25, 2005, Administrative Law Judge Patricia Leary Flierl denied Plaintiff's application.  Plaintiff appealed this determination to this Court (No. 1:07-cv-00754-AWI-DLB).  On April 22, 2008, Plaintiff stipulated to dismissal of the appeal, agreeing with the Commissioner that her claim lacked merit.

On May 3, 2007, Plaintiff again filed for disability insurance benefits, alleging disability beginning January 28, 2004, attributable to non-Hodgkin's lymphoma.  Her claim was denied initially on September 7, 2007, and upon reconsideration on January 17, 2008.  On February 26, 2008, Plaintiff timely requested an administrative hearing.  Plaintiff appeared and testified at a hearing on May 8, 2009.  On September 8, 2009, Administrative Law Judge Stephen W. Webster denied Plaintiff's application. The Appeals Council denied review on June 11, 2010.  On July 30, 2010, Plaintiff filed a complaint seeking this Court's review.

### B.   Agency Record

Plaintiff (born September 15, 1959) was trained in cosmetology but is no longer licensed to perform that work.  She was last employed as a food service worker.  She has given up her drivers' license; her husband and adult daughter drive her where she needs to go.  She receives financial support from Calworks.

Plaintiff testified that she was able to perform her own personal grooming.  She cooked, did laundry, and did "a little bit" of housework.  She watered the garden.  Plaintiff watched two or three hours of television daily and read.  She visited with relatives and was able to attend church.  When questioned by her own attorney, Plaintiff stated that she no longer socialized.

Plaintiff testified that she suffered from chronic pain that her medication could not eliminate.  She could sit for 20 to 30 minutes; stand for an hour; walk for ten or fifteen minutes; and lift about five pounds.  Plaintiff disclosed that she had abused cocaine from 1993 to 2000.  Plaintiff testified that she suffered from nightmares and depression related to her having been raped in her twenties; the nightmares and depression had worsened since her prior application for disability benefits.

Plaintiff's husband, Paul Ruiz, was also unemployed, although he sometimes had jobs doing gardening or similar work.  Ruiz testified that Plaintiff had been suffering nightmares and

hot flashes since before 2005; these symptoms were worsening.  Plaintiff woke up screaming, which frightened their ten-year-old daughter.  Plaintiff no longer socializes.

**Dr. Koster.**  Dr. Koster treated Plaintiff at the Hematology Oncology Medical Group in Fresno.  Koster reported that Plaintiff's lymphoma was in remission in 2004, 2005, 2006, and 2007.  He noted that Plaintiff had been in remission since 2001.  On May 16, 2007, Koster noted that Plaintiff's diagnosis of fibromyalgia pre-dated her lymphoma treatment and that another physician prescribed medication for that illness.  Koster ordered annual body scans and lab work, which were performed at St. Agnes Hospital.  The results of the scans and lab work were normal except for elevated glucose and triglycerides.

**Dr. Castro.**  I. Yolanda Castro, M.D., was reportedly Plaintiff's primary care physician.  The record includes no treatment notes, reports, or opinions prepared by Castro.

**Dr. Kecskes.**  As indicated on her treatment notes, Diane W. Kecskes, M.D., was a consultant, who was a board-certified physician in psychiatry and family practice.  Plaintiff only saw Kecskes annually but contacted her monthly by telephone to renew prescriptions.  The record includes Kecskes' "service notes" from September 29, 2003 to June 23, 2007.

Before the decision in Plaintiff's prior application for benefits, Kecskes diagnosed Plaintiff with major depression, recurrent, and post traumatic stress disorder resulting from rape.  She prescribed antidepressant medications and recommended that Plaintiff receive therapy.  On October 13, 2003, Kecskes noted that Plaintiff had entered perimenopause and was experiencing irritability, hot flashes, and fatigue.  Plaintiff complained of recurrent dreams of a thin man assaulting her and threatening to cut her throat.  She reported crying spells and paranoia.

When the first hearing decision issued in January 2005, Kecskes was still trying to determine the appropriate medication and dosage to relieve Plaintiff's symptoms, but Plaintiff continued to complain of depression, fatigue, and muscle aches and pains.  Plaintiff declined group therapy.  Kecskes' inability to identify the proper drugs at effective dosages is repeated throughout her notes.  The notes throughout this period also reflect Plaintiff's difficult relationships with her husband and with her adult daughter, who did not like Plaintiff's husband.
///

The notes reported that Plaintiff's appointments were primarily for medication management and "supportive listening."

On March 14, 2005, Kecskes referred Plaintiff to a rheumatologist, Dr. Bertken, for evaluation of her fibromyalgia. Bertken was to perform laboratory testing necessary to diagnose fibromyalgia.[1]

On April 11, 2005, Plaintiff reported hearing voices and complained of chronic pain. On May 9, 2005, Kecskes reported that she had completed SSI forms for Plaintiff's attorney. Kecskes noted that Plaintiff appeared overwhelmed by somatic problems and had multiple cold sores on her face.

On August 8, 2005, Kecskes recommended a trial of gabapentin and neurontin to address Plaintiff's fibromyalgia and chronic pain syndrome. Plaintiff requested that Kecskes agree to become her primary care physician since Dr. Castro, her current primary care physician, would only see her once or twice annually. Kecskes' note regarding her response to this is unclear, but she did not become Plaintiff's primary care physician.

In a letter to the Administrative Law Judge, dated October 5, 2005, Kecskes wrote:

> Lena Baker has been under my psychiatric care since 2002 for severe enduring PTSD symptoms that interfere with her day to day functioning. The extent of her problems include psychotic symptoms for which she is prescribed 2 antipsychotics to control auditory voices of her trauma, disorganized and delusional thinking that affect her doing her ADL's. She is also on several antianxiety and antidepressant medications. She is unable to work due to her chronic mental illness. She is being seen every 2-4 weeks and sometimes sooner as symptoms emerge.

AR 349.

On October 17, 2005, Plaintiff reported that the neurontin seemed to help her pain, but only if she "doubled up on them." Kecskes increased the dosage.

On October 16, 2006, two months after Plaintiff reported that her SSI application had been appealed, Kecskes noted:

> Lena was seen today. Her mental health is such that she is unemployable. She is depressed and unable to do the things that she used to do because of chronic pain

///

---

[1] The record contains no evidence that Plaintiff ever saw Dr. Bertken.

related to fibromyalgia.  She is chronically fatigued.  Her fatigue has her bed bound [*indecipherable*].  She has deteriorated.  Her stressors are compound[ed] by financial stress as she is unable to work a 4 or 8 hour [indecipherable].

AR 287.

Kecskes' plans and recommendations included "notify attorney of gravity."  AR 287.

Plaintiff was less depressed on November 13, 2006.  On December 11, 2006, Plaintiff told Kecskes that she had thoughts of hanging herself in the garage.  On both December 11, 2006, and February 12, 2007, Kecskes noted that SNRI medications (antidepressants) had no effect on Plaintiff's depression.  In February, Kecskes noted that Plaintiff was not psychotic but was stressed out by her bills.  Plaintiff told Kecskes that her family was destitute.  On March 12, 2007, Kecskes noted that Plaintiff's chronic pain was being helped by antidepressants and pain medications.

The April 16, 2007 notes reported that Plaintiff's family including her parents-in-law, her older daughter, and her grandsons had gathered together for Easter, reducing Plaintiff's stress over family relationships.  Plaintiff "continue[d] to stress, worry, & become anxious over finances, debt, and [reduced] resources."  AR 281.

On June 23, 2007, Kecskes' plans and recommendations included social rhythm therapy and Plaintiff's reapplying for SSI based on her depression and post traumatic stress disorder.

In a medical verification of physical and mental incapacity for CalWorks, dated December 30, 2008, Kecskes reported that Plaintiff had a permanent disability and could perform no work.

On May 22, 2009, Kecskes wrote to the ALJ, ostensibly in response to his request for such a letter,[2] which had been conveyed to Kecskes by Plaintiff's then-attorney, Gina Fazio.  Kecskes reported that she had treated Plaintiff from "about 2002 to about August 2007" when she closed her practice.  Addressing the period from January 25, 2005 to December 31, 2006, Kecskes wrote:

During this period of time I saw her regularly in my office, but she never required inpatient hospitalization, etc.
        * * * * *
She was not in a day treatment program for the mentally ill.  However, she remained on medications for her symptoms.  The dosages were adjusted based on the clinically diagnosed presentation.  During my entire treatment of her, the extent

[2] The ALJ denied having made such a request.

5

of the treatment remained outpatient and medication driven with limited in-office therapy.

AR 350-51.

Kecskes explained that, when she determined to close her practice, she gave Plaintiff referrals to other psychiatrist on two occasions.  Nonetheless, Plaintiff told Kecskes that she had been unable to secure an appointment with any other psychiatrist "due to the back log in Fresno County Medical."  Accordingly, Kecskes continued to refill Plaintiff's prescriptions and to complete Plaintiff's CalWorks documentation as a courtesy.

**Residual functional capacity.**  On August 24, 2007, medical consultant C.E. Lopez prepared a physical residual functional capacity analysis on behalf of the agency.  Lopez opined that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently; could sit, stand, and walk for six hours in an eight-hour work day; had unlimited ability to push and pull; and had no other limitations.  In the accompanying case analysis, Lopez observed:

> At the time of the [2005] ALJ decision, the [claimant] stated the depression & mood swings started [with] the diag[nosis] of cancer.  She did not seek psychiatric [treatment] until she was denied disability on request for reconsideration.  There was credibility issues [with claimant's activities of daily living] & therefore the ALJ gave little weight to her subjective complaints.  Currently, [claimant] states she is being treated for depression & PTSD. [Medical expert report] from [treating physician] does not note any problems nor does claimant complain of any mental problems.

AR 330.

On August 29, 2007, Robert B. Paxton, M.D., completed a mental physical residual functional capacity analysis on behalf of the agency.  In Paxton's opinion, Plaintiff had no significant limitations except for moderate limitation in her ability to understand, remember, and carry out detailed instructions.  In the accompanying psychiatric review technique, Paxton noted that Plaintiff possessed an affective disorder that resulted in mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties is maintaining concentration, persistence, and pace.  Paxton found that Plaintiff had experienced two repeated

///

///

///

1 episodes of decompensation, each of extended duration.[3]  He provided no narrative explanation

2 for his findings.

3     **Vocational expert.**  Vocational expert Cheryl Chandler testified that, since Plaintiff no

4 longer had a cosmetology license, she had no transferable skills.  In the first question, the ALJ

5 directed Chandler to assume a hypothetical individual of Plaintiff's age, education, and work

6 history, who could lift 50 pounds occasionally and 25 pounds frequently; could sit, stand, or walk

7 for six of eight working hours; and required any interpersonal contact to be superficial and

8 incidental to work.  Chandler opined that Plaintiff could perform her prior work as a cafeteria

9 worker but not as a cosmetologist.

10     The ALJ next directed Chandler to assume a hypothetical individual of Plaintiff's age,

11 education, and work history, who could lift 20 pounds occasionally and ten pounds frequently;

12 could sit, stand, or walk for six of eight working hours; and could have occasional contact with

13 supervisors, co-workers, and the public.  Chandler responded that such an individual could not

14 perform either of Plaintiff's prior jobs.  Because of her social restrictions, Plaintiff could perform

15 light custodial jobs or positions in which she would work in after hours circumstances.  For light

16 custodial work (DOT No. 831687030), about 8000 jobs in California would include only

17 occasional interpersonal contact.  Plaintiff could perform light, unskilled agricultural work (DOT

18 No. 406687010), which includes about 6000 suitable jobs in California, or working in the back of

19 dry cleaning or similar facilities (DOT No. 589685030), with about 2000 jobs available in

20 California.

21     The ALJ next directed Chandler to assume a hypothetical individual of Plaintiff's age,

22 education, and work history, who could lift ten pounds; could sit, stand, or walk for six of eight

23 working hours; and could have occasional contact with supervisors, co-workers, and the public.

24 Chandler opined that such a person could do assembly production work jobs (DOT No.

25 726687046), with 5200 jobs available in California; sorting and inspection (DOT No.

26 921687086), 1700 jobs in California; or hand packaging (DOT No. 559687014), 2000 jobs in

27 ────────────────

28     [3]  Nothing in the agency record accounts for Paxton's findings of repeated episodes of decompensation,
each of extended duration.  Judge Webster found that no such episodes existed.

1 California.  In response to a question from Plaintiff's attorney, Chandler opined that if the

2 hypothetical individual was also moderately limited in their ability to maintain attention and

3 concentration, however, no jobs would be available.

4       Finally, the ALJ directed Chandler to assume a hypothetical individual of the same

5 description as the individual in question number two except that this individual would not be able

6 to complete an eight-hour day or a forty-hour week without interruption from psychologically

7 based symptoms.  Chandler replied that no jobs would be available for such an individual.

8 **II.   Legal Standards**

9       To qualify for benefits, a claimant must establish that he or she is unable to engage in

10 substantial gainful activity because of a medically determinable physical or mental impairment

11 which has lasted or can be expected to last for a continuous period of not less than twelve months.

12 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of

13 such severity that he or she is not only unable to do his or her previous work, but cannot,

14 considering age, education, and work experience, engage in any other substantial gainful work

15 existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

16       Plaintiff had acquired sufficient quarters of coverage to be insured through December 31,

17 2006.  Accordingly, to be eligible for a period of disability and disability benefits, Plaintiff had to

18 establish that she became disabled on or before December 31, 2006.[4]

19       To encourage uniformity in decision making, the Commissioner has promulgated

20 regulations prescribing a five-step sequential process for evaluating an alleged disability.  20

21 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following

22 questions:

23     Step one:    Is the claimant engaging in substantial gainful activity?  If so, the
24                   claimant is found not disabled.  If not, proceed to step two.

    Step two:    Does the claimant have a "severe" impairment?  If so, proceed to
25                   step three.  If not, then a finding of not disabled is appropriate.

26 ///

27

28   [4] Although Plaintiff's application for disability insurance reports her intent to apply for SSI, nothing in the agency record indicates that Plaintiff applied for supplemental security income ("SSI").

8

| | |
|---|---|
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

In addition, when an applicant has one or more previous denials of applications for disability benefits, he or she must overcome a presumption of nondisability.  The principles of *res judicata* apply to administrative decisions, although the doctrine is less rigidly applied in administrative proceedings than in court.  *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988); *Gregory v. Bowen*, 844 F.2d 664, 666 (9th Cir. 1988).  Social Security Acquiescence Ruling ("SSR") 96-4(9), adopting *Chavez*, applies to cases involving a subsequent disability claim with an unadjudicated period arising under the same title of the Social Security Act as a prior claim in which there has been a final administrative decision that the claimant is not disabled.  A previous final determination of nondisability creates a presumption of continuing nondisability in the undjuducated period.  *Lester*, 81 F.3d at 827.  The presumption may be overcome by a showing of changed circumstances, such as new and material changes to the claimant's residual functional capacity, age, education, or work experience.  *Id.* at 827-28; *Chavez*, 844 F.2d at 693.

In her detailed and well-reasoned 2005 hearing decision, ALJ Flierl found that Plaintiff had not engaged in substantial gainful activity since the alleged disability date of November 12, 2001.  Plaintiff had several severe impairments: depression; post traumatic stress disorder; non-Hodgkin's lymphoma, in remission; and a history of substance abuse.  The ALJ rejected Plaintiff's allegations that she had fibromyalgia, finding that no evidence in the record supported a finding that fibromyalgia had ever been diagnosed by analyzing the presence of pain at tender points or by other means.  None of Plaintiff's impairments met the listing criteria for any impairment.  ALJ Flierl found that, Plaintiff had the residual functional capacity to lift and carry fifty pounds occasionally and twenty-five pounds frequently; to stand, walk, and sit for up to six

1  hours each in an eight-hour day; and to crouch, crawl, push, and pull occasionally. Her depression

2  limited her to simple, repetitive tasks.  Interpersonal contact should be superficial and incidental

3  to the work to be performed.  Plaintiff was limited to little contact with the public.

4        Plaintiff was not able to perform her prior skilled work as a hairdresser.  Nonetheless, she

5  retained the residual functional capacity to perform a wide range of unskilled medium work.

6  Accordingly ALJ Flierl found Plaintiff not to be disabled.

7        In the September 8, 2009 hearing decision ALJ Webster acknowledged that, under

8  Acquiescence Ruling 97-4(9), when adjudicating a subsequent claim for an unadjudicated period,

9  he was required to apply a presumption of nondisability unless Plaintiff rebutted the presumption

10 by demonstrating a changed circumstance, such as increased severity of her impairment, a change

11 in age category, or the existence of a new impairment.  ALJ Webster found that not only did

12 Plaintiff's evidence support the presumption of continuing non-disability, it established a more

13 expansive residual functional capacity.

14       The ALJ found that Plaintiff had not engaged in substantial gainful activity from the onset

15 date of January 28, 2004 through December 31, 2006, the last date on which she was insured.  She

16 had three severe impairments: fibromyalgia; depression; and post traumatic stress disorder.[5]

17 Because Plaintiff's non-Hodgkin's lymphoma had then been in remission for seven years, the ALJ

18 considered it to be a non-severe impairment.  None of Plaintiff's impairments met or equaled the

19 requirements of a listed impairment.

20       Plaintiff retained the residual functional capacity to lift and carry fifty pounds occasionally

21 and twenty-five pounds frequently; to stand, walk, and sit for up to six hours each in an eight-hour

22 day; and to crouch, crawl, push, and pull occasionally. She was limited to interpersonal contact

23 that was superficial and incidental to the work to be performed.  Because Plaintiff remained able

24 to perform her past relevant work as a food service worker, she was not disabled.

25 ///

26

27        [5] Elsewhere in the hearing decision, ALJ Webster acknowledged Plaintiff's claims of fibromyalgia but
   found that although medical reports in the record reported that Plaintiff had been diagnosed with fibromyalgia, no
28 actual diagnosis based on tender points was documented.  In addition, Plaintiff had not followed the medical advice
   of several physicians who had referred her to a rheumatologist for diagnosis and treatment of her fibromyalgia.

**III.    Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,* *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

**IV.    Plaintiff's Subjective Symptom Testimony**

Plaintiff contends that the ALJ erred in rejecting Plaintiff's subjective testimony of her symptoms.  Emphasizing that Plaintiff fails to acknowledge the existence of the 2005 hearing decision, which is *res judicata* in this case, the Commissioner responds that Plaintiff simply failed to meet her burden of establishing changed circumstances.

**A.    2005 Hearing Decision**

The contrast between Plaintiff's medical records and Plaintiff's greatly exaggerated symptoms was at the heart of ALJ Flierl's 2005 finding that Plaintiff's subjective symptom testimony was simply not credible.  The judge noted that Plaintiff refused to allow Dr. Rustom Damania, the agency's consulting physician, to perform a complete physical examination, and later discussed Plaintiff's behavior in greater detail;

> Rustom Damania, M.D., performed an internal medicine consultative examination of the claimant in January 2003.  The doctor noted that the claimant was driven to the exam by a "male friend" who held both of claimant's arms and her back as she

walked, and accompanied her into the exam room. The claimant stated she had not driven for three years. She reported being in remission from non-Hodgkin's lymphoma for six to seven months, but now had fibromyalgia with pain in her neck, back, shoulders, arms, elbows, and hands every day. She said all her joints swelled every day and Motrin helped a little. The claimant reported having headaches and becoming irritable and mean two to three times per week for six months. She denied smoking, alcohol, or drug addictions. She said she used to cry a lot and stay alone, but that was a lot better. She said her 23 year old daughter came to help her with chores, cooking, and showers. During Dr. Damania's exam, the claimant sat comfortably on the table, was focused, and made good eye contact. She answered all questions, but did not follow all instructions because she moaned and groaned and said she was in a tremendous amount of pain. On examination of her extremities and joints, the claimant moaned and groaned very loudly on slight touch. Dr. Damania noted the claimant's tenderness was disproportionate to the amount of palpation. The claimant declined to do all the ranges of motion, but her joints did not have any ankylosis or deformity. Her hands were able to do pinch tests and thumb-fingertip tests. There was no atrophy of the palmar muscles, her grip was good at 5/5, and she had good power and normal range of motion. The claimant's cervical spine was tremendously tender but had no spasms or deformities. Her thoracic spine was tender on slight palpation and touch but had no deformity. The lumbar spine was very painful to light touch, but had no spasm or deformities. The claimant was able to get on the table, but required her friend to help get her off. The claimant's straight-leg raising was normal but she complained of pain in her knees. Her deep tendon reflexes and gait were normal, and she did not need an assistive device. The examination further showed the claimant had no lymphadenopathy; her reflexes and sensory perception were normal, Romberg's sign was negative, and power was 5/5 in the upper and lower extremities. Dr. Damania stated he could not localize any trigger points because no matter where he touched her, the claimant said it produced pain. Dr. Damania made a diagnosis of non-Hodgkin's lymphoma in remission, depression by history but better, and fibromyalgia by history. He stated there was no objective evidence for gross physical disability. The claimant had no ankylosis, contracture, or inflammation. He further stated that the only symptoms were subjective, and the only objective findings were that on slight touch the claimant overreacted with complaints of excessive pain. Dr. Damania opined that the claimant was able to sit, stand and walk, and needed no assistive device. He stated that the claimant could perhaps do moderate activity or moderate exertional limitations, and occasionally bend, stoop, and crouch. He was not able to provide any other limitations because of the claimant's failure to comply with testing.

AR 58-59.

The ALJ also described Plaintiff's behavior at the psychiatric consultative examination:

Shireen Damania, M.D., performed a psychiatric consultative evaluation of the claimant in December 2004 at the request of the Administrative Law Judge. Dr. Damania reviewed Rustom Damania's report and Diane Kecskes' notes. The doctor stated that the claimant wanted the door closed to the interview room because someone was following her. She reported her husband made his living at gardening, then said he was on SSI. She said her problem was depression for the past five years. She said she was raped when she was 17 and was molested by a brother-in-law while she was asleep. The claimant told Dr. Damania that she is in constant pain from fibromyalgia. She also said she had bitten her nails for a long time. She said she took illegal drugs, but not for eight years, and quit alcohol 15 years prior. The examination showed the claimant made poor eye contact until

asked what 2 + 2 was and indicated 3.  After the doctor made a comment, she looked directly at the doctor and counted on her fingers and said it was 4.  The claimant was cooperative, and her mood was mildly depressed and vaguely anxious.  Her affect was appropriate with no suicidal or homicidal ideations.  Her impulse control and frustration tolerance were within normal limits.  She had no delusions or hallucinations, but indicated she sometimes saw people at the window.  The claimant was oriented, her memory was grossly intact, and her attention span was normal.  She recalled two of three objects in three minutes.  She had average intelligence, but was not interested in knowing who the president was.  After using her fingers to add 2 + 2, she easily performed other simple math calculations such as 5 x 5 and 10 - 7.

AR 59-60.

Judge Flierl rejected opinions offered by Kecskes, noting (1) Kecskes saw Plaintiff periodically for medication management but not for therapy; (2) Kecskes' opinions relied primarily on Plaintiff's subjective complaints, which Judge Flierl found less than credible; and (3) Kecskes' opinion appeared to have been provided as an accommodation to Plaintiff prior to the hearing.  The judge added that Plaintiff had not received any psychiatric treatment other than medication and that Plaintiff had not followed Kecskes' recommendations for therapy.

Judge Flierl addressed Plaintiff's claims of severe pain:

Weighing all relevant factors, the Administrative Law Judge finds the claimant's impairments are not as limiting as she alleges.  The claimant was not given a definitive diagnosis of fibromyalgia.  Dr. Fang noted only fibromyalgia-like symptoms at first, but later used fibromyalgia as a diagnosis.  However, nowhere in the medical evidence is there noted the requisite tender points for fibromyalgia.  The claimant appears to be exaggerating her symptoms, nowhere more evidently than at the consultative examination in January 2003.  The doctor noted the claimant complained of severe pain anywhere he tried to touch her.  However, there is no reference anywhere else in the medical evidence to support the claimant suffering from such an extreme degree of pain.  Her treating physician noted she complained of pain, particularly in her neck and back, but there is no mention that every one of her joints was exquisitely tender to the slightest touch as she reported to Dr. Damania.  The doctor himself noted that the claimant's complaints of pain were disproportionate to the degree of palpation.  A person who suffers from pain as debilitating as the claimant reported to Dr. Damania would typically be hospitalized, would be taking strong narcotic pain medicine, and would have been referred to a pain specialist for injections, a TENS unit, physical therapy, or any of the many modalities available for the relief of chronic pain.  However, no such options have been suggested.  The claimant's treating physician did not refer her to a pain specialist.  Her cancer doctor would not give her prescription pain killers and told her to take NSAID's.  On January 22, 2003, Dr. Koster wrote that the claimant was "doing extremely well."  She did not complain to him of fibromyalgia or of any severe pain.  However, one week later, she was in Dr. Damania's office in such pain that she needed to be held by both arms to walk into the office.  Dr. Kecskes' notes do not mention the claimant being in severe pain or discomfort in their face-to-face interviews.  Dr. S. Damania did not mention the claimant being in pain as recently as December 2004.  At the hearing, the claimant

13

1   did not appear to be in severe pain.  At the hearing, the claimant told the
    Administrative Law Judge she cannot work due to mood swing and other
2   psychological symptoms, but did not mention fibromyalgia.  The Administrative
    Law Judge finds such inconsistencies substantially diminish the claimant's
3   credibility.

4       AR 61-62.

5       Judge Flierl also discussed in detail inconsistencies within Plaintiff's testimony, and

6   between the testimonies of Plaintiff and Ruiz.  She emphasized that although Plaintiff claimed

7   that her depression and mood problems began when her cancer was diagnosed, Ruiz testified that

8   Plaintiff's depressive symptoms pre-dated her lymphoma.  In addition, Plaintiff did not seek

9   psychiatric help nor was it recommended by her doctors in the course of her cancer treatment.

10  Plaintiff only sought psychiatric treatment, observed the ALJ, when her disability application was

11  denied on reconsideration.  Even then, she only took medication and failed to follow Kecskes'

12  recommendations for therapy.

13      **B.**      **2009 Hearing Decision**

14      Judge Webster evaluated Plaintiff's claims based on the *Chavez* standard.  He found no

15  objective medical evidence of any physician confirming Plaintiff's claimed fibromyalgia.  In

16  addition, although Plaintiff told Kecskes that she was "bed bound" by the pain and fatigue of

17  fibromyalgia, neither the record nor Plaintiff's own testimony were consistent with that claim.

18  Plaintiff did not follow-up on Kecskes' referral to a rheumatologist.  Instead, the record showed

19  that Plaintiff's chosen medical treatment consisted primarily of Kecskes' renewing her

20  medications by telephone.

21      The ALJ found that, based on Kecskes' records, Plaintiff's complaints of nightmares were

22  neither new nor more frequent.  He observed further that Ruiz testified that Plaintiff socialized

23  through December 2006, but became more isolated thereafter.  Thus, Plaintiff's claims that she no

24  longer socialized were immaterial since her  disability insurance coverage ended on December 31,

25  2006, before her claimed isolation.

26      **C.**      **Discussion**

27      An ALJ is not "required to believe every allegation of disabling pain" or other non-

28  exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti*, *v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

[T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*  Social Security Administration rulings specify the proper bases

1  for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's
2  testimony cannot be supported by reasons that do not comport with the agency's
   rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have
3  the same force and effect as the statute or regulations, they are binding on all
   components of the Social Security Administration, . . . and are to be relied upon as
4  precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th
   Cir. 1998) (concluding the ALJ's decision at step three of the disability
5  determination was contrary to agency rulings and therefore warranted remand).
   Factors that an ALJ may consider in weighing a claimant's credibility include
6  reputation for truthfulness, inconsistencies in testimony or between testimony and
   conduct, daily activities, and "unexplained, or inadequately explained, failure to
7  seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603;
   *see also Thomas*, 278 F.3d at 958-59.

8      *Orn*, 495 F.3d at 635.

9      Here, Judge Webster thoughtfully explained his reasons for discounting Plaintiff's

10  credibility in detail, emphasizing the inconsistencies in Plaintiff's own testimony and between

11  Plaintiff's and Ruiz's testimony.  He contrasted Plaintiff's claims with Kecskes' service notes for

12  treatment before and after the 2005 hearing decision.  His determination was supported by

13  substantial evidence.  Having reviewed the record as a whole, the Court agrees with the ALJ's

14  assessment of Plaintiff's lack of credibility.

15      Totally ignoring the 2005 determination, Plaintiff argues that Judge Webster's findings do

16  not comply with Social Security Ruling 96-7p.  She is wrong.  "No symptoms or combination of

17  symptoms can be the basis for a finding of disability, no matter how genuine the individual's

18  complaints may appear to be, unless there are medical signs and laboratory findings demonstrating

19  the existence of medically determinable physical or mental impairment(s) that could reasonably be

20  expected to produce the symptoms."  SSR 96-7p.  Under the regulations, an individual's

21  statement(s) about his or her symptoms is not enough in itself to establish the existence of a

22  physical or mental impairment or that the individual is disabled.  *Id.*

23  **V.    Opinions of Dr. Kecskes**

24      Plaintiff contends that Judge Webster failed to articulate a legally sufficient rationale for

25  his rejection of Kecskes' opinions.  The Commissioner responds that the ALJ properly rejected

26  Kecskes' opinions to the extent that (1) they were based on Plaintiff's subjective complaints,

27  which were demonstrably inconsistent with her medical records and activities of daily living,

28  ///

rendering them not fully credible and (2) they were ultimate opinions reserved to the
Commissioner.  This Court agrees with the Commissioner.

Judge Webster gave little weight to Kecskes' opinions, noting that Kecskes never provided
Plaintiff with full therapy but oversaw Plaintiff's prescriptions.  Kecskes' opinion was derived in
large part from her incorrect belief that Plaintiff's depression and post traumatic stress disorder
were triggered or aggravated by her fibromyalgia and the severe pain it produced.  For example,
Kecskes relied on Plaintiff's misrepresentation that she was "bed bound" by her pain.  In addition,
Kecskes' notes set forth no new medical findings or facts that had arisen after the January 2005
hearing decision, except for "reiterations of the subjective symptoms stated by the claimant."  As
Judge Webster put it, "Dr. Kecskes has simply taken the subjective symptoms at face value,
without discounting them based on credibility factors."  AR 23.

Despite Plaintiff's assertion to the contrary, the ALJ gave "little or no weight to the
psychological opinion expressed by the other State agency medical consultants."  AR 23.  In
rejecting Plaintiff's claims of psychological disability, Judge Webster did not adopt the opinions
of the agency consultants or reviewers: he concluded that her condition did not change from that
already evaluated in the January 2005 opinion in the period before the expiration of her insurance
coverage in December 2006.

### A.   Ultimate Opinions

An ALJ is "not bound by an expert medical opinion on the ultimate question of disability."
*Tomasetti*, 533 F.3d at 1041; Social Security Ruling 96-5p.  "Although a treating physician's
opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ
with respect to the existence of an impairment or the ultimate determination of disability."
*Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

The ALJ appropriately disregarded Kecskes' multiple opinions that Plaintiff was fully
disabled.  Such opinions included (1) the October 5, 2005 letter in which Kecskes stated that
Plaintiff "is unable to work due to her chronic mental illness"; (2) the October 16, 2006 note that
Plaintiff's "mental health is such that she is unemployable"; and (3) the December 30, 2008
certification to CalWorks that Plaintiff had a permanent disability and was unable to work.

17

1    **B.    Reliance on Plaintiff's Misrepresentations**

2        As expressed throughout her service notes, Kecskes' theory of Plaintiff's mental health

3    problems was that Plaintiff was depressed because (1) her chronic pain prevented her from

4    performing her prior activities; (2) her fatigue had her bed bound; and (3) her stressors are

5    compounded by financial problems resulting from her physical inability to work.  Plaintiff's

6    impaired credibility has been addressed above and will not be repeated here. The reliability of

7    Kecskes' opinions is severely challenged to the extent they depend on her acceptance of Plaintiff's

8    misrepresentations of her physical and mental condition in the absence of any corroborating

9    medical evidence.

10        A court considers whether the Commissioner properly rejected a medical opinion by

11   assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support

12   the opinions.  The ALJ may reject the uncontradicted opinion of a treating or examining medical

13   physician only for clear and convincing reasons supported by substantial evidence in the record.

14   *Lester*, 81 F.3d at 831.  The ALJ must set forth a detailed and thorough factual summary, address

15   conflicting clinical evidence, interpret the evidence and make a finding.  *Magallanes v. Bowen*,

16   881 F.2d 747, 751-55 (9th Cir. 1989).  Judge Webster did so here.

17   **C.    Summary**

18        The ALJ need not give weight to a conclusory opinion supported by minimal clinical

19   findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

20   Although an ALJ is not bound by opinions rendered by a plaintiff's physicians regarding the

21   ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and

22   convincing reasons for rejecting them.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). The

23   ALJ must tie the objective factors or the record as a whole to the opinions and findings that he or

24   she rejects.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  Judge Webster properly

25   concluded that Kecskes' opinions were largely conclusory, and to the extent the opinions were not

26   impermissibly conclusory, were based on Plaintiff's questionable subjective accounts in the

27   absence of supporting medical evidence.

28   *///*

## IV.   Conclusion and Order

Because she failed to demonstrate any change in her condition following the 2005 hearing decision, *res judicata* applied.  As a result, Plaintiff failed to carry her burden of proving that she was disabled prior to the expiration of her insurance coverage on December 31, 2006. Accordingly, this Court hereby AFFIRMS the agency's determination that Plaintiff was not disabled before the expiration of her disability insurance benefits.  The Clerk of Court is directed to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:   October 19, 2011            /s/ Sandra M. Snyder            **
                                         UNITED STATES MAGISTRATE JUDGE